**SONESTA INTERNATIONAL HOTELS CORPORATION, Plaintiff-Appellant,**

v.

**WELLINGTON ASSOCIATES et al., Defendants-Appellees.**

**No. 1055, Docket 73–1785.**

United States Court of Appeals, Second Circuit.

Argued June 5, 1973.

Decided July 3, 1973.

Robert W. Sweet, New York City (Kurt Koegler, Henry P. Wasserstein, Thomas J. Schwarz, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for plaintiff-appellant.

Jesse Climenko, New York City (Sheldon D. Camhy, Shea Gould Climenko & Kramer, New York City, of counsel), for defendants-appellees.

Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Sonesta International Hotels Corp. ("Sonesta") appeals from the denial of a preliminary injunction sought against Wellington Associates, the latter's partners Sol Goldman and Alex DiLorenzo, and all persons acting on their behalf (herein collectively referred to as "Wellington"), to enjoin Wellington, during the pendency of this action, from (a) acquiring or attempting to acquire in any manner any shares of stock of Sonesta, (b) voting any shares of Sonesta stock held or acquired after the initiation of the plan, combination or conspiracy of the defendants alleged by Sonesta in its

complaint, (c) exercising, directly or indirectly, any influence upon the management of Sonesta, and (d) otherwise utilizing any such stock or shares of Sonesta stock previously acquired as a means of controlling or affecting the management of Sonesta. Sonesta also sought an order directing Wellington to vote its shares of Sonesta stock in favor of Proposals Nos. 3 and 4 set forth in Sonesta's Notice of Annual Meeting, dated April 16, 1973, which relate to shareholder authorization for the sale of Sonesta's interests in two hotels and the distribution of the net proceeds of the sales to common shareholders, expected to amount to about $2 per share, subject to a favorable tax ruling and the adoption of a plan of partial liquidation by Sonesta's Board of Directors.

The gravamen of Sonesta's complaint, brought on by order to show cause before Judge Ryan, is that Wellington failed to disclose, in connection with its cash tender offer announced in the Wall Street Journal on May 9, 1973, for 1,000,000 [1] shares of Sonesta common at $7 per share, several material facts which were necessary to make the cash offer, as published, and the Schedule 13D filed with the SEC on May 8 concerning the cash offer, not misleading, in violation of §§ 10(b), 13(d), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(d), 78n(d), and 78n(e) (1971). These laws are founded on the principle that full and fair disclosure of all material facts must be made to investors so that they may have the benefit of the facts in making their investment decisions. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S. Ct. 1456, 31 L.Ed.2d 741 (1972); 1968 U.S.Code Cong. & Adm.News p. 2813.

Sonesta filed its complaint on May 14, 1973. Judge Ryan heard argument on May 17, and on May 22 he rendered a written decision denying Sonesta's request for a preliminary injunction, finding no showing of irreparable injury on the part of Sonesta or likelihood of success on the merits, and specifically finding no false or misleading statements or omissions in the 13D statement or in the tender offer. The offer expired on May 21, according to its terms, with 419,623 shares having been tendered to Wellington. On May 23 Judge Ryan entered an order in accordance with his decision of the previous day. Sonesta thereupon sought and obtained a stay from another panel of this court, which also expedited the appeal. Sonesta's Annual Meeting, scheduled for May 24, went forward as planned, and the necessary two-thirds shareholder approval was obtained for Sonesta's Proposals 3 and 4, described above.

For reasons hereinafter stated we hold that Wellington failed to disclose material facts in its Schedule 13D filed with the SEC and in its Tender Offer announced to the public. We therefore reverse with directions to enter a preliminary injunction preventing consummation of the offer subject to the conditions of supplemental disclosure and rescission noted below.

Sonesta claims that in four respects Wellington omitted to state information material to an informed choice by Sonesta shareholders as to whether they should accept Wellington's cash offer of $7 per share. More specifically, it is claimed that the Schedule 13D and the published offer failed to disclose (1) that Wellington owed Sonesta approximately $2.4 million, which amount might be compromised on terms adverse to Sonesta's stockholders if Wellington should acquire control, (2) that Wellington's plan to abstain from voting on Proposals 3 and 4 at the Annual Meeting could result in the defeat of these Proposals for failure to obtain the required approval of two-thirds of Sonesta's issued outstanding shares, thereby causing Sonesta shareholders to be deprived of a partially tax-free cash distribution of about

---

1. If less than 1,000,000 shares were tendered, Wellington agreed to purchase all such shares, and it reserved the right to purchase any tendered shares over that amount.

$2 a share, (3) that Sonesta might lose its listing on the New York Stock Exchange if Wellington should receive the number of tenders it sought, and (4) that a number of buildings owned by Wellington had received adverse notoriety in certain publications which had described the buildings as havens of prostitution, illicit massage parlors, pornographic film theaters, and peep shows, and that this negative publicity could harm the business reputation and credit standing of Sonesta if Wellington should acquire control.[2]

Before turning to consideration of the alleged omissions in greater detail, it is important to restate the standard to be applied in determining whether, at the instance of a target corporation, a preliminary injunction should be issued against the continuation of a proposed tender offer when it is claimed that the offer and supporting materials, such as a Schedule 13D required by 17 C.F.R. § 240.14d–1 (1972), fail to adequately disclose material information necessary to make the statements contained in the offer not misleading. The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Co., 476 F.2d 687, 692–693 (2d Cir. Mar. 12, 1973); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). Assuming that such a showing is made prior to consummation of the tender offer, a preliminary injunction will normally afford prompt relief against a violation of § 14(e), which makes it unlawful to make any untrue statement of a material fact in connection with any tender or to omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 547 (2d Cir. 1967). As the Supreme Court noted in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 383, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), in dealing with § 14(a), which makes it unlawful to solicit proxies in contravention of SEC rules, including Rule 14a–9 which prohibits solicitations containing misleading statements or omissions, "[u]se of a solicitation that is materially misleading is itself a violation of law, as the Court of Appeals recognized in stating that injunctive relief would be available to remedy such a defect if sought prior to the stockholders' meeting."

Where the foregoing standard has been met preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of the Act, for the reason that prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions. See, e. g., Butler Aviation Int'l Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2d Cir. 1970). But once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to "unscramble the eggs." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969); Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc., *supra*, 476 F.2d 687, 698. On the other hand, preliminary relief does not, in assuring that the offer will be lawfully made, sacrifice the legitimate desires of shareholders to accept the offer. If the offeror is subsequently vindicated after a trial on the merits, the offer may be renewed. Thus, in the normal situation, when it appears likely that the offer may contain materially misleading statements or

2. On this appeal, Sonesta does not press another claim it raised in the District Court—that Wellington failed to disclose its intent to change Sonesta's business.

omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated.

■ The probability of success on the merits in any application for injunctive relief turns greatly upon whether the plaintiff has shown that the tender offer under attack has misstated or omitted *material* facts. The materiality of facts allegedly misstated or omitted depends, in turn, upon whether a reasonable investor might have considered them to be important in deciding whether to accept the tender offer. This standard was set forth by the Supreme Court in Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S. Ct. 1456, 31 L.Ed.2d 741 (1972), where the Court, in finding that the withholding of a material fact established the requisite element of causation in fact, expressed itself as being concerned with materiality "in the sense that a reasonable investor might have considered [the misstated or undisclosed facts] important in the making of this decision [whether to sell shares]." See Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2d Cir. 1970) ("inaccurate statements . . . which may have had some tendency to affect the decision of Butler stockholders with respect to the exchange offer").[3]

■■ To be material a statement in a tender offer need not necessarily relate to a past or existing condition or event. It may refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc., *supra,* 476 F.2d at 697; Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1298 (2d Cir. 1973). A reasonable stockholder, once informed of the contingency, can then determine whether to assume the risk of its occurrence or non-occurrence in accepting or rejecting the tender offer. Where the event, if it should occur, could influence the stockholder's decision to tender, the chance that it might well occur is a factor that should be disclosed to the investor for consideration in making his or her decision.

■ Applying these principles here, we are satisfied that Sonesta has made a clear showing, upon undisputed facts, that Wellington failed in violation of § 14(e) to disclose certain material facts in its tender offer. After making due allowance for the wide discretion normally permitted the district court in deciding whether to issue a preliminary injunction, Stark v. New York Stock Exchange, 466 F.2d 743, 744 (2d Cir. 1972), it appears that in this case the district judge plainly erred in applying an incorrect standard as to materiality and in concluding that certain of the omissions charged by Sonesta did not entitle it to preliminary relief.

The most persuasive claim by Sonesta is that Wellington did not sufficiently disclose that it owed more than $2.4 million to Sonesta and that this debt might be compromised on terms adverse to Sonesta shareholders if Wellington should

---

3. The test of materiality has elsewhere been stated in terms of whether the decision of a reasonable investor "would" have been affected had the true circumstances been properly disclosed, rather than whether it "might" have been so affected. Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 363 (2d Cir. 1973) ; Gulf & Western, *supra,* 476 F.2d at 696; and especially Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1301–1303 (2d Cir. 1973). Whatever difference that phraseology may make, we are satisfied that the omissions in Wellington's offer would be materially misleading under either of the standards expressed above and under the Supreme Court's understanding of the definition of materiality applied by it in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) ; and Affiliated Ute Citizens v. United States, *supra.*

succeed in acquiring control of Sonesta. Wellington's offer neglected to mention that Sonesta had obtained a judgment in New York State Supreme Court against Wellington in the sum of $1,896,584.32 arising out of a property dispute concerning the land underlying the Plaza Hotel, which is owned 50% by each of the parties, and that Sonesta had asserted against Wellington a claim for over $500,000 in back real estate taxes which has not been disputed. Wellington's tender offer limited itself to informing Sonesta's stockholders of the existence of a dispute between it and Sonesta over the valuation of the land underlying the Plaza Hotel, which had resulted in a decision fixing the value of that land (upon which the rental formula was dependent) at $18,500,000, from which Wellington had appealed, claiming that the value should be materially greater.[4]

Judge Ryan concluded that "while it might have been better to have stated the actual dollar figure [of the judgment] . . . this is not a major or deceptive omission" and that the disclosure of the dispute "was more than adequate." We disagree. Disclosure of the dispute over the valuation of the land, while a step in the right direction, hardly put Sonesta's stockholders on notice that Sonesta had obtained an $1,896,584 judgment against Wellington which, when supplemented by a separate claim for over $500,000, brought Wellington's total indebtedness to Sonesta up to more than $2.4 million, an amount equal to nearly 10% of Sonesta's equity and nearly $1 per Sonesta share. By describing the dispute in more general terms, Wellington deprived Sonesta's shareholders of the knowledge of just how much was actually at stake in litigation which admittedly might be resolved on terms less favorable to Sonesta shareholders if Wellington should succeed in its takeover bid. As Judge Friendly observed in Gerstle v. Gamble-Skogmo, Inc., *supra,* 478 at 1298 "the English language has sufficient resources that the draftsman could have done better than he did". Here a simple reference in relevant Arabic numerals to the money judgment in favor of Sonesta and to its claim for back taxes (which the tender offer did not even mention) would have alerted Sonesta stockholders to the potential significance of the possible compromise of the judgment and of the tax claim. The standard of materiality was not whether the non-disclosure was "major," as Judge Ryan indicated, but whether a reasonable stockholder might have attached importance to the omitted facts. If these simple facts had been disclosed in the present case, we have no hesitancy in concluding that a reasonable shareholder, contemplating a sale of all or part of his shares, might well have considered the information to be of considerable importance in making his decision.

We turn next to Sonesta's claim that Wellington failed to disclose certain material facts with respect to the possible effect of its decision to abstain from voting on Propositions 3 and 4 at Sones-

---

4. "Wellington owns one-half of the land (acquired by it in 1965) at Fifth Avenue and 59th Street, New York 10022 where The Plaza Hotel (hereinafter 'Plaza') is located. Sonesta owns the other half of the land and the building, operates the Plaza and leases one-half of the land from Wellington. There is a long standing dispute between Wellington and Sonesta as to the proper application of the lease formula fixing the rentals payable by Sonesta. Litigation commenced several years ago has not been finally resolved. Wellington is presently appealing a decision fixing the value of the land (upon which the rental formula is dependent) at $18,500,000 which it claims should be materially greater. If Wellington acquires control of Sonesta, it will be able to influence the position taken by Sonesta in the dispute so that Sonesta's position becomes such that Wellington deems it fair and equitable and consistent with Wellington's fiduciary obligations to all shareholders of Sonesta. In such an event, it is possible that Sonesta will receive less than it would if Wellington does not acquire control of Sonesta."

ta's Annual Meeting scheduled for May 24, 1973. These resolutions, if affirmatively approved by two-thirds of Sonesta's issued and outstanding shares, called for liquidation of its leasehold interest in two hotels for approximately $5,150,000. Subject to a favorable income tax ruling from the Internal Revenue Service and adoption of a plan of partial liquidation and approval by Sonesta's Board of Directors, the net proceeds of the sale were to be distributed to Sonesta stockholders, who would receive nearly $2 per share (or approximately 28.5% of the $7 tender offer price), partially free of income tax. Although Wellington's tender offer stated that it would abstain from voting on the two proposals, it failed to disclose that if its offer to purchase 1,000,000 shares (out of Sonesta's 2,393,817 outstanding common shares) should be reasonably successful and result in its acquiring more than 767,440 shares,[5] the defeat of the proposals would be certain, since the remaining shares outstanding, even if voted in favor of the proposals, would be less than the two-thirds required for approval.

Judge Ryan concluded that it was unnecessary for Wellington to have pointed out that a successful completion of its tender offer could defeat the liquidation proposals because it was "purely hypothetical and an 'if' situation" since it was unknown at the time of the offer how many shares would be tendered and whether other shareholders would vote for the proposals. We disagree. The test of materiality is not whether a possible consequence of the offer was contingent or hypothetical, Gerstle v. Gamble-Skogmo, Inc., *supra*, but whether it was a factor that might be considered of some importance by a Sonesta stockholder in making his decision. We believe that it was. It is true that Wellington's offer has not been as successful as it had hoped (undoubtedly due in part to Sonesta's opposition) and that the two pro-

posals have since been approved by a small margin at Sonesta's Annual Meeting. But this post-offer occurrence does not render the offer any the less misleading. Section 14(e) prohibits omissions which are misleading "in the light of the circumstances under which they are made." In an analogous situation, we have recently concluded that the "facts that, at the time it announced its tender offer, an antitrust action had not been commenced against G&W, and that its liability was uncertain, does not excuse G&W's failure to disclose all these relevant circumstances so that A&P shareholders could weigh them in reaching their decision whether or not to tender their shares." Gulf & Western, *supra*, 476 F.2d at 697. See also Bath Industries, Inc. v. Blot, 427 F.2d 97, 112 (7th Cir. 1970). No sound reason appears why the full circumstances of the possible defeat of the proposals (which might have yielded the shareholders an amount equal to approximately 28.5% of Wellington's $7 offering price) should not have been set forth in the offer in the first instance.

Nor do we have any difficulty in concluding that Wellington should have disclosed the prospect that if its offer should be fully successful Sonesta common stock could have lost its listing privileges on the New York Stock Exchange. Judge Ryan concluded that the possibility of delisting was too speculative to make this omission material. We disagree. Section A-16 of the Exchange Rules permits but does not require removal or suspension of a listed security if the publicly held shares number less than 600,000 and their aggregate market value is less than $5 million. Of Sonesta's 2,393,817 outstanding shares, 1,572,839 were publicly held according to the Exchange's definition, the balance of 820,978 being owned by officers and directors of Sonesta and their immediate families. If Wellington had achieved its goal of acquiring 1,000,000 shares, the

---

5. Wellington had previously acquired 30,500 shares of Sonesta which, if added to 767,440 or more shares received pursu- ant to the tender offer, would amount to more than one-third of the 2,393,817 total outstanding shares.

publicly held stock would have been reduced below the Exchange standards in both number and aggregate value. Wellington again suggests that it could not know in advance how many Sonesta shareholders would accept its offer. Sonesta counters, by affidavit of its general counsel, that the Exchange had advised Sonesta that it could lose its listing privileges if Wellington's offer was successful. Under these circumstances the risk of delisting was sufficiently appreciable to require disclosure. As we stated in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969):

> "[W]hether facts are material . . . when the facts relate to a particular event . . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."

Loss of listing on the Exchange would deprive Sonesta shareholders of a ready market for their shares and of the protection of certain Exchange requirements, including its disclosure rules. The possibility of losing these advantages could certainly have been of importance to a Sonesta shareholder in deciding whether to retain some Sonesta shares or to tender all. Although Wellington has not received as many tenders as it sought and there does not now appear to be a prospect of immediate delisting as a result of the immediate offer, the consequences of Wellington's nondisclosure cannot on that account be dismissed as moot since there remains the possibility of further offers which could have the cumulative result of subjecting Sonesta common to the possibility of delisting.

■ Finally, Sonesta complains that Wellington should have disclosed that it has been the subject of adverse comment in the New York Post and other publications for allegedly owning properties which have been used by prostitutes, illicit massage parlors, pornographic film theaters, and peep shows. Sonesta notes that Wellington has instituted an action for libel against the Post and others for alleged damage to its reputation and suggests that Wellington was under an obligation to state that, should it acquire control of Sonesta, Sonesta's reputation might be similarly impaired. On this issue we agree with Judge Ryan's conclusion that Sonesta's claim lacks an adequate basis. Indeed the record would indicate that the claim emanates more from overzealousness than from proof indicating any substantial risk of damage to Sonesta's reputation.

It is not disputed that Wellington filed a Schedule 13D with the SEC on the day before making public its offer which furnished such information regarding its "background" as was required by § 13(d) of the Act and 17 C. F.R. § 240.13d–101 (1972). Nor is it denied that Wellington is the owner of a number of well-respected hotels which it operates in New York City and elsewhere. On the basis of what is before us, we see no reason why Wellington should have described the allegations of unsavory conduct which it had not only denied but has claimed to be libelous in a suit instituted by it against the New York Post. Sonesta does not assert that the allegations are true but only that they have given Wellington notoriety. But Wellington owes no duty to repeat what it considers to be false statements about itself, thereby giving currency to the allegedly libelous matter and increasing the risk that it might unjustly incur notoriety.

■■ Wellington attempts to excuse its failure to disclose the facts we have found material on the grounds (1) that although Sonesta published a message to its shareholders on May 14 (five days after the offer was first made) it did not refer to the money judgment, to the effect of abstention or to the possibility of delisting, from which we are asked to infer that Sonesta did not consider these facts material, and (2) that any deficiencies have been overcome by the gen-

erosity of Wellington's $7 offer, which exceeded the prices at which Sonesta common had been trading in previous weeks. While the failure of a target company to seize an opportunity to rectify claimed omissions may have some bearing on their materality, General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 162 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), and while it would have been in the interests of disclosure for Sonesta itself to have drawn its stockholders' attention to the possible consequences of their tendering Sonesta shares, which Wellington had omitted, it would emasculate the purposes of the Williams Act to allow the offeror to look to the target company to remedy the offeror's own material deficiencies in disclosure. The obligation is placed squarely on those making the offer in the first instance to disclose all material factors necessary to make *their offer* not misleading. That duty cannot be shifted to the shoulders of others. As for the suggestion that the generosity of the offer should reduce Wellington's obligation to inform the shareholders of all relevant circumstances, we must reject any such nullification of the disclosure requirements of the Act, as did the Supreme Court in a similar situation with respect to proxy violations in Mills v. Electric Auto-Lite, *supra*, 396 U.S. at 381–385, 90 S.Ct. 616.

As the tender offer has not yet been consummated and the interests of all parties may be protected in allowing only a lawful offer to be completed, we *reverse and remand with directions* to enter a preliminary injunction enjoining the consummation of the offer unless Wellington makes a supplemental disclosure to Sonesta stockholders setting forth (1) the facts concerning the money judgment Sonesta presently has against it and Sonesta's claim against it for back real estate taxes, and (2) the possibility of delisting of Sonesta's common stock by the New York Stock Exchange if Wellington should receive a greater number of shares on any future offer, and unless Wellington offers to those tendering shareholders who responded to its current offer an opportunity within a reasonable period of time to rescind their tenders. See Butler Aviation International, Inc. v. Comprehensive Designers, Inc., *supra*, 425 F.2d at 844–845.