DELAWARE RIVER PORT
AUTHORITY, Plaintiff,

v.

Norbert T. TIEMANN, as Administrator,
Federal Highway Administration,
and
William T. Coleman, Jr., as Secretary,
United States Department of
Transportation, Defendants,
and
City of Philadelphia,
Defendant-Intervenor.

Civ. A. No. 75–1219.

United States District Court,
D. New Jersey.

Oct. 1, 1976.

Alexander Feinberg, Evoy & Feinberg, Cherry Hill, N. J., Duane, Morris & Heckscher, Philadelphia, Pa., of counsel by Roland Morris, Philadelphia, Pa., for plaintiff Delaware River Port Authority.

Jonathan L. Goldstein, U. S. Atty. by Frederick W. Klepp, Asst. U. S. Atty., Newark, N. J., Dowell H. Anders, Deputy Chief Counsel, Fed. Hwy. Adm., U. S. Dept. of Trans., Gerald M. Tierney, Trial Atty., Fed. Hwy. Adm., U. S. Dept. of Trans., Washington, D. C., of counsel, for defendants Norbert T. Tiemann and William T. Coleman, Jr.

Sheldon L. Albert, Sol., City of Philadelphia by Herbert Smolen, Deputy City Sol., Philadelphia, Pa., for the intervenor City of Philadelphia.

OPINION

BROTMAN, District Judge.

This case involves the continuing review of a determination by the Federal Highway Administrator (hereinafter "Administrator") on May 19, 1975 reducing tolls on bridges owned and operated by the Delaware River Port Authority (hereinafter

"Authority" or "DRPA"). *See Delaware River Port Authority v. Tiemann,* 403 F.Supp. 1117, 1120–23 (D.N.J.1975), *vacated* 531 F.2d 699 (3rd Cir. 1976). This court upheld the Administrator and on November 12, 1975 entered an order granting Summary Judgment for the Defendants, Norbert T. Tiemann, Administrator, Federal Highway Administration, and William T. Coleman, Jr., Secretary, United States Department of Transportation, and the Intervenor, City of Philadelphia. *Delaware River Port Authority v. Tiemann, supra.* The Administrator's toll schedule took effect December 1, 1975. 403 F.Supp. at 1144.

The Court of Appeals vacated, instructing this court to retain jurisdiction, but remand the action to the Administrator "so that he may supplement his opinion by making specific and itemized findings on this record as to the Authority's post-coverage expenses and its ability to meet these expenses on the basis of the revenue derived from the Administrator's toll schedule." 531 F.2d at 702.[1] Pending the Administrator's reconsideration, the Court of Appeals directed that the present toll schedule remain in effect. Id. The Administrator issued an Opinion and Order on May 7, 1976 setting forth his supplemental Findings (hereinafter "Findings").

The Administrator's Findings with respect to post-coverage expenses are summarized at Appendix F–A of his Findings:

APPENDIX F–A[2]
ESTIMATED DEBT SERVICE COVERAGE
(In thousands of dollars)

|  |  | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| 1. | Gross Tolls | 32,449 | 35,119 | 36,277 | 36,705 |
| 2. | Less Disc. | − 790 | − 842 | − 878 | − 875 |
|  |  | 31,659 | 34,277 | 35,409 | 35,830 |
| 3. | M & O Exp. | −10,256 | −13,773 | −14,599 | −15,476 |
| 4. | Adm. Exp. | − 2,088 | − 2,234 | − 2,369 | − 2,511 |
|  |  | 19,315 | 18,270 | 18,441 | 17,843 |
| 5. | Invest. Income | + 3,898 | + 3,790 | + 3,682 | + 3,466 |
| 6. | Net Income | 23,213 | 22,060 | 22,123 | 21,309 |
| 7. | Debt Service Req. Rev. Bonds | 16,769 | 16,769 | 16,769 | 16,769 |
| 8. | Debt Service Coverage | 1.38 | 1.32 | 1.32 | 1.27 |
| 9. | Special Rev. Bonds Req. 1.0 Coverage | 3,099 | 2,502 | 2,903 | 2,365 |
| 10. | Total Debt Service Requirements | 19,868 | 19,271 | 19,672 | 19,134 |
| 11. | Total Debt Service Coverage | 1.16 | 1.14 | 1.12 | 1.11 |
|  | *Post Coverage Exp.* |  |  |  |  |
| 12. | PATCO Opt. Def. | 148 | 1,027 | 723 | 533 |
| 13. | World Trade Div. | 1,364 | 1,200 | * | * |
| 14. | Cap. Budget Exp. | 1,470 | * | * | * |
| 15. | TOTAL | 2,982 | 2,227 | 723 | 533 |
| 16. | Total Activities Cost | 22,850 | 21,498 | 20,375 | 19,667 |
| 17. | Net Income | 23,213 | 22,060 | 22,123 | 21,309 |
| 18. | Total Activity Coverage | 1.02 | 1.03 | 1.08 | 1.08 |

1. The record consists of the testimony taken and exhibits introduced into evidence at the administrative hearings conducted to adjudicate the reasonableness and justness of the Authority's toll increase effectuated on April 1, 1972. 403 F.Supp. at 1121–23.

2. Appendix F–A follows the form and figures set forth in Appendix F of the Administrator's Opinion and Order of May 19, 1975. 403 F.Supp. at 1133 n. 44. Although Appendix F confined itself to debt service coverage, Appendix F–A treats also post-coverage expenses.

[Administrator's Explanatory Notes to Appendix F–A]

| | |
|---|---|
| Lines 1–8, 10, & 11 | are identical with Appendix F of Administrator's May 19, 1975 opinion. Line 9 was added to indicate amount of debt service requirement of the Special Revenue Bonds. |
| Line 12. | Figures based on comparing revenue and expenses in Exhibit 136, p. 21. |
| Line 13. | 1975 Figure based on Exhibit 139, DRPA Budget. The budget was rejected by the Administrator as unreliable in issuing the May 19 Order, affirmed by the District Court, 403 F.Supp. at 1131. 1976 Figure based on budget of the World Trade Division Exhibit 114, DRPA General Fund Payments. |
| Line 14. | Figure in 1975 DRPA budget Exhibit 139. The budget was rejected by the Administrator as unreliable in his May 19, 1975 Order, affirmed 403 F.Supp. at 1131. |
| Line 15. | Figure arrived at by adding lines 12, 13, and 14. |
| Line 16. | Figure arrived at by adding lines 10 and 15. |
| Line 17. | Repeat of line 6 for the purpose of illustration. |
| Line 18. | Ratio of line 17 to line 16. |
| * | Figures not in the record or offered into the record by DRPA. Projections would be arbitrary and misleading in that there are no figures in the record on which to base a rate of projection. |

This court must determine whether the Administrator's supplemental findings concerning post-coverage expenses are supported by substantial evidence and are the product of reasoned decision-making. 403 F.Supp. at 1126–29.[3] Included within the term post-coverage expenses are: PATCO (highspeed rail commuter line) deficits, expenses of the World Trade Division, capital budget expenditures and litigated damage claims. 531 F.2d at 701. The Administrator's toll schedule may be affirmed only if it will sustain the Authority's "total activities." *Id.* At bottom, this court's review must concern itself with the validity of the Administrator's projections or non-projections, as the case may be, found at lines 12–14 of Appendix F–A.[4] Also involved is the Administrator's determination that litigated damage claims are not legitimate post-coverage expenses such as would warrant their inclusion in Appendix F–A. For the reasons to be developed, the Administrator's supplemental findings with respect to post-coverage expenses must be sustained.

### PATCO DEFICITS

The Administrator projects PATCO operating deficits in the amounts of $148,000 in 1975, $1,027,000 in 1976, $723,000 in 1977 and $533,000 in 1978. Appendix F–A, line 12.[5] Concerning PATCO deficits, the DRPA candidly represents that it is attempting to curtail these deficits through fare adjustments in 1976.[6] Effective June 2, 1976 increased passenger fares went into effect on the highspeed line.[7]

The fare increase is not a matter of record. Consequently no valid projections can be made measuring the extent to which PATCO's operating deficits may be reduced by the increased fares. Accordingly, for the purposes of this review, the court must accept the Administrator's projections.

### WORLD TRADE DIVISION

The Administrator projects $1,364,000 for World Trade Division expenses in 1975.

**3.** Post-coverage expenses are those budgeted expenses remaining after the Authority's bond service requirements have been met. 531 F.2d at 701.

**4.** See Appendix F–A(1), lines 11–13, *infra.*

**5.** The Authority underwrites the operating deficits of PATCO, its wholly-owned subsidiary. Exhibit 136, the DRPA's 1974 Prospectus, at 14.

**6.** Exceptions of the Authority to the Findings of the Administrator, With Argument (hereinafter "Exceptions of Authority") at 6 n. 12.

**7.** Response of Intervenor In Support of the Findings of the Administrator, and Contra to the Exceptions of the Authority at 2–3, Supplement A; Response of the Administrator to the Exceptions of the Authority at 10–11.

Appendix F–A, line 13. This figure is derived from Exhibit 139, the Authority's 1975 Capital and Operating Budget. For 1976 the Administrator allows $1,200,000. This projection is based upon Exhibit 114, the Authority's projection of General Fund payments for the period 1974–1976. With respect to 1977 and 1978, the Administrator determined that the record afforded no basis upon which valid projections could be made.[8] The Administrator's "non-finding" for 1977 and 1978 is based upon his disinclination to make projections or estimates for future years "unless based on projections which were introduced into the record." Findings at 2.

The Authority takes issue with the Administrator contending that, at the very least, World Trade expenses must be projected at the 1975 Budget (Exhibit 139)

level of $1,364,000 for 1976, 1977 and 1978. Concerning 1976 specifically, the Authority maintains that the Administrator should not have relied upon Exhibit 114, which it characterizes, not incorrectly, as a general planning estimate. But Exhibit 114 provides the only record basis upon which a specific and itemized finding for 1976 World Trade expenses can be made.

While the record provides no basis upon which precise figures can be projected for 1977 and 1978, it is nevertheless apparent that the Authority will have World Trade expenses in these years.[9] Counsel for the Federal Highway Administration concedes as much in Appendix F–A(1) wherein $1,251,000 is allowed for each year. Appendix F–A(1) is attached to the Response of the Administrator to the Exceptions of the Authority, which serves as the Defendant's brief in this matter:

APPENDIX F–A(1) [10]
ESTIMATED DEBT SERVICE COVERAGE
(In thousands of dollars)

| | | 1975 | 1976 | 1977 | 1978 |
|---|---|---|---|---|---|
| 1. | Gross Tolls | 32,449 | 35,119 | 36,277 | 36,705 |
| 2. | Less Disc. | − 790 | − 842 | − 868 | − 875 |
| | | 31,659 | 34,277 | 35,409 | 35,830 |
| 3. | M & O Exp. | −10,256 | −13,773 | −14,599 | −15,476 |
| 4. | Adm. Exp. | − 2,088 | − 2,234 | − 2,369 | − 2,511 |
| | | 19,315 | 18,270 | 18,441 | 17,843 |
| 5. | Invest. Income | + 3,898 | + 3,790 | + 3,682 | + 3,466 |
| 6. | Net Income | 23,213 | 22,060 | 22,123 | 21,309 |
| 7. | Debt Service Req. Rev. Bonds | 16,769 | 16,769 | 16,769 | 16,769 |
| 8. | Debt Service Coverage | 1.38 | 1.32 | 1.32 | 1.27 |
| 9. | Total Debt Service Requirements | 19,868 | 19,271 | 19,672 | 19,134 |
| 10. | Total Debt Service Coverage | 1.17 | 1.14 | 1.12 | 1.11 |
| | Post Coverage Expenses | | | | |
| 11. | PATCO Opt. Deficit | 148 | 1,027 | 723 | 533 |
| 12. | World Trade Div. | 1,364 | 1,200 | 1,251 | 1,251 |
| 13. | Cap. Budget Exp. | 1,470 | * | * | * |
| 14. | TOTAL | 2,982 | 2,227 | 1,974 | 1,784 |
| 15. | Total Activities Cost | 22,850 | 21,498 | 21,646 | 20,918 |
| 16. | Net Income | 23,213 | 22,060 | 22,123 | 21,309 |
| 17. | Total Activity Coverage | 1.02 | 1.03 | 1.02 | 1.02 |

**8.** Appendix F–A, Administrator's Explanatory Note designated by asterisk.

**9.** The record reveals that "[e]xpenses for World Trade are expected to continue. . ." Exhibit 18 at 9.

**10.** Apart from the World Trade figures, Appendix F–A(1) is in all material respects identical to Appendix F–A.

Although Appendix F–A(1) cannot constitute part of the Administrator's formal findings, the court must realistically treat this concession by counsel for the Administrator as an amendment to the findings under review.

The $1,251,000 figure for 1977 and 1978 represents the average amount actually expended by the World Trade Division during the period 1970–1974. (Exhibits 21, 101, 102 and 137). This figure is supportable since the record reveals a marked fluctuation of World Trade expenses during the period 1965–1974,[11] ranging from a low of $746,000 in 1965 to a high of $1,494,000 in 1970 followed by a substantial decrease to $1,061,000 in 1972 and $1,076,000 in 1973.

Upon first reflection the Administrator's projection of World Trade figures for 1977 and 1978 in Appendix F–A(1) appears somewhat inconsistent with his determination that the record does not permit specific and itemized findings. But Appendix F–A(1) demonstrates a rational and realistic judgment by the Administrator that there will be World Trade expenses in 1977 and 1978; it projects, as best can be done on this record, World Trade expenses for 1977 and 1978.

## CAPITAL BUDGET EXPENDITURES

Capital budget expenditures are treated on line 14 of Appendix F–A. For 1975 the Administrator allowed $1,470,000 in capital budget expenditures. This figure was taken from Exhibit 139, the Authority's 1975 Capital and Operating Budget.

The Administrator concluded that he could not, on this record, make projections

for capital budget expenditures in 1976, 1977 and 1978. In his explanatory note to line 14 the Administrator articulated the rationale supporting this "non-finding":

Figures not in the record or offered into the record by DRPA. Projections would be arbitrary and misleading in that there are no figures in the record on which to base a rate of projection.

Because the Authority does not make up its capital budget for a given year until October or November of the preceding year,[12] this record does not afford a basis upon which valid projections for capital budget expenditures in years other than 1975 can be made.

Since the current toll schedule provides coverage in excess of 1.0,[13] the Administrator found that a surplus exists to support capital budget expenditures not documented in the record. Findings at 3. Implicit in the Administrator's findings is his understanding that the DRPA will have legitimate capital budget expenses in 1976, 1977 and 1978. Although the Administrator recognizes that x amount of dollars will be allocated by the Authority in its capital budget in each year,[14] he is simply unable on this record to project x.

## LITIGATED DAMAGE CLAIMS

■  The record reveals a potential litigation exposure of some $22,000,000,[15] excluding a condemnation claim of $20,423,000.[16] Thomas Auchter, the Authority's Director of Finance and Treasurer, testified that no budgetary provision had been made for the legal claims.[17] His testimony revealed the speculative nature of these claims most

11.  Exhibit 18 at 9 for 1965–1969.

12.  1974 Transcript, Vol. I. at 75–76.

13.  Allowing for World Trade expenses in 1977 and 1978, Appendix F–A(1) projects coverage of 1.03 for 1976, 1.02 for 1977 and 1.02 for 1978.

14.  The record reveals actual capital expenditures to be less than budgeted due to a 5–10% cushion in the Authority's capital bu_get, 1974 Transcript, Vol. I. at 77, as well as items budg-

eted, but unspent, and hence carried from year to year by the Authority. *Id.* at 76.

15.  Exhibit 117; Exhibit 136 (1974 Bond Prospectus) at 45.

16.  Although not on this record, the Authority represents that this claim has been preliminarily adjudicated against the Authority in the amount of $3,000,000, but is currently on appeal. Exceptions of Authority, at 7 n. 14.

17.  1974 Transcript, Vol. I. at 105.

plainly: "I don't know when or how much any of the items on [Exhibit] 117 are going to be paid. I don't know when or how much they are going to be."[18] Because the litigation is in varying stages of pretrial preparation, the Authority represented in its 1974 Bond Prospectus, which was "distributed, as required by law, to the bond community and the investing public as an accurate and true picture of the DRPA's financial position," 403 F.Supp. at 1133, that "it is impossible to predict the outcome or extent of liability, *if any.*" [emphasis added[19]].

The record reveals that the DRPA concedes nothing with respect to these claims. Indeed the 1974 Bond Prospectus represents that the Authority "is vigorously contesting each of these matters and is asserting what it believes to be valid defenses and counterclaims."[20] Conceivably if the Authority prevails on its defenses and counterclaims, litigated damage claims may come to represent a net plus for the Authority. In any event, absent satisfactory settlements, the Authority predicts that the litigation of these claims will extend for a considerable period of time.[21]

Because the legal claims represented in Exhibit 117 are not a "budgeted [activity]," 531 F.2d at 701, and are "speculative in nature," Findings at 2, the Administrator rejected them as a legitimate post-coverage expense. He concluded that "[s]ince the Authority cannot predict the effect of these [litigated damage] claims on its financial needs, it is unreasonable to expect the Administrator to consider the claims in developing a toll schedule." *Id.*[22]

### CONCLUSION

In summary, the Administrator's findings are supported by substantial record evidence. Moreover, his findings reflect a reasoned decision-making process. As line 17

of Exhibit F–A(1), which is adjusted to reflect World Trade expenses for 1977 and 1978 demonstrates, the toll schedule under review allows a total activity coverage of 1.02 in 1975, 1.03 in 1976, 1.02 in 1977 and 1.02 in 1978. Translated into dollars a surplus remains in the amount of $363,000 in 1975, $562,000 in 1976, $477,000 in 1977 and $391,000 in 1978.

Admittedly the coverage is thin and a legitimate question may be raised concerning whether a surplus is "available to support activities not in the record," Findings at 3, specifically capital budget expenditures. But the Administrator cannot do the impossible; he cannot make specific and itemized findings where the record is silent.

One final point may be made with respect to capital budget expenditures. As of December 31, 1974 moneys in the General Fund amounted to $5,074,256.81. Exhibit 137, DRPA Balance Sheet, 1974. These moneys are available to meet capital budget expenditures and other post-coverage expenses:

> After full provision has been made for all the requirements of the Special Revenue Bond Resolution and the 1972 and 1974 Special Obligation Bond Resolutions, moneys remaining in the General Fund may be used for any purpose of the Authority. Further payments from the General Fund are expected to be made to fund operating deficits, if any, of the Rapid Transit System, expenses of the Authority's World Trade Division and certain capital improvements to the existing Rapid Transit System. Exhibit 136 at 7.

Ample moneys exist therefore in the General Fund to cover any legitimate capital budget expenditures not provided for on line 17 of Appendix F–A(1),[23] as well as

18. *Id.* at 114.

19. Exhibit 136 at 45.

20. *Id.*

21. *Id.*

22. One need only speculate as to the astronomical toll increase which would be required, if

for example the Bethlehem Steel claim were adjudicated against the DRPA in the amount of $17,000,000 to confirm the sound logic inherent in the Administrator's decision-making process.

23. Prudent and responsible capital budgeting must, of course, reflect and be constrained by the level of funds available from toll revenues.

PATCO deficits and World Trade expenses.[24]

Having determined that the Administrator's post-coverage findings on this record are supported by substantial evidence and are the product of a reasoned decision-making process, it does not demean this court's limited function of judicial review to give credence to certain realities. Indeed there is almost a nonsensical quality to reviewing in late 1976 a record which was closed in early 1975, 403 F.Supp. at 1140, when the toll schedule under review is based upon a four-year projection terminating in 1978. While this court's initial order upholding the toll schedule was on appeal, the Authority sought to supplement the record to include its 1976 proposed budget. The Court of Appeals refused to reopen the record, citing "the need for a prompt and limited reconsideration rather than a reopening of the record." 531 F.2d at 702. Accordingly, this court has confined itself strictly to the record, even to the extent of not considering non-record items of which it might fairly have taken judicial notice.[25]

As 1977 approaches, the situation is markedly different than that which existed when this record was closed early in 1975. The Authority now has the benefit of actual experience with two new bridges, as well as an increase in PATCO fares. Although the existing record indicates that the Authority can live with the current toll schedule, the DRPA has the option of immediately petitioning the Administrator for modification of the toll schedule and a reopening of the record.[26] In any event, since the current toll structure is based on projections extending only through 1978, it is evident that the matter of the reasonableness and justness of the Authority's tolls will shortly have to be considered again on a new record.[27]

For the present, it is sufficient to sustain the Administrator's Opinion and Order of May 7, 1976. This court's previous Order granting Summary Judgment for the Defendants and the Intervenor shall be reinstated, and the present toll schedule shall continue to remain in full force and effect. Counsel shall submit an appropriate order.

---

24. Indeed since the General Fund may be used for any purpose by the DRPA, it remains available also to meet the expense of any legal claims that may become due.

25. See discussion concerning PATCO operating deficits and the recent PATCO fare increase. With respect to litigated damage claims several of the cases listed on Exhibit 117 are on this court's docket; settlement negotiations are progressing at figures far less than the potential exposure reflected in the record.

In July 1975 hearings were held by the court and testimony was taken on the issue of whether a failure to stay the Administrator's May 19, 1975 Order pending full review by the court would cause the Authority irreparable harm. The court indicated that any testimony taken would only be utilized with respect to the stay and not be considered when reviewing the record. At the hearing Thomas Auchter testified that DRPA toll revenues for 1975 were, as of July 1975, exceeding projections by several million dollars. Opinion on Motion for Stay, July 23, 1975, at 5 n. 4.

26. The Bridge Toll Procedure Rules, 49 C.F.R. 310.1 et seq., have recently been amended to add 49 C.F.R. 310.4a which "provide[s] a mechanism for the modification of orders setting toll rates." 41 Federal Register 23957 (1976). See also 403 F.Supp. at 1134 n. 49.

27. At such time the Administrator might consider an issue left open by the Court of Appeals, namely "the extent to which the Administrator may limit the Authority's use of toll generated revenues to subsidize its other activities." 531 F.2d at 701 n. 4.